# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 5, 2012

No. 07-70037

Lyle W. Cayce
Clerk

TROY CLARK,

Petitioner–Appellant,

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent–Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, STEWART, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Troy Clark, convicted of capital murder and sentenced to death in Texas state court, appeals the denial of his petition for a writ of habeas corpus. Clark asserts that his trial counsel rendered ineffective assistance by failing to investigate and develop mitigating facts that could have been presented at the punishment stage of his trial. The district court determined that Clark was not entitled to relief on this claim but granted a certificate of appealability (COA). Because the state court did not unreasonably apply clearly established federal law on the record before it, we affirm.

No. 07-70037

Clark also seeks a COA on four other claims that his trial counsel rendered ineffective assistance. Those include assertions that his counsel: (1) in closing argument, violated his duty of loyalty to Clark, failed to plead for mercy, and failed to present mitigating evidence; (2) "opened the door" to damaging evidence of another murder committed by Clark; (3) allowed introduction of evidence of another extraneous offense; and (4) failed to object to a comment made by the district court allegedly pertaining to Clark's credibility. The district court's decision denying relief on these claims is not debatable among reasonable jurists, and Clark's claims are not adequate to deserve encouragement to proceed further. We deny his request for a COA on these issues.

## I

## A

Clark lived with Tory Bush in Tyler, Texas, where the couple used and sold methamphetamine. The victim, Christina Muse, briefly resided with Clark and Bush, and when she moved out of their residence, Clark became concerned that she would inform law enforcement of his drug-dealing activities.

Bush testified that on May 19, 1998, Muse returned to the couple's home for a social visit. Clark attacked Muse with a stun gun, informing her that she "should have kept [her] mouth shut." Clark then used duct tape to bind her hands and legs and to cover her mouth. He placed Muse in a bedroom closet, where he talked to her for some time. Clark eventually left her alone there for several hours while he played video games and sold drugs to a customer. Upon returning to the bedroom, Clark moved Muse to the bathroom and asked Bush to get him a board, which he used to strike Muse. He then filled the bathtub with water and ordered Bush to help him drown Muse by holding her head underwater. When Muse stopped breathing, Clark placed her body in a blue barrel, later adding cement mix, water, and lime. The next morning, at Clark's direction, Bush placed trash and debris in the top of the barrel. Clark then hid

No. 07-70037

the barrel on his landlord's property located outside of town.  Several months later, Clark was arrested and charged with capital murder.

## B

In March of 2000, a jury convicted Clark of capital murder at the close of the guilt–innocence phase of trial.  At the punishment phase, the state presented numerous witnesses who testified that Clark had murdered two other people, committed rape and assault, burned a car, and dealt drugs.  Defense counsel informed the jury in his opening statement that he would present evidence demonstrating that Clark would not be a future danger to society because he could "function successfully in the penitentiary."  Counsel also told the jury that he had "no witnesses to bring you under mitigation.  I have nobody."  A defense expert testified that, based on a risk-assessment grounded in actuarial data, Clark would not be a future danger in prison.

Clark took the stand on his own behalf, against the advice of counsel, at the punishment phase.  In a colloquy with counsel outside the presence of the jury, Clark confirmed that he had refused to allow his attorneys to call his mother and father to testify.  Clark also acknowledged that he had personally contacted other potential mitigation witnesses and instructed them not to testify on his behalf.  He expressed his desire to tell the jury that he wanted to receive the death penalty.  In a contentious exchange with the prosecutor on cross-examination, Clark ultimately so testified.

The jury determined that Clark presented a future danger to society, that he had caused or intended Muse's death, and that there were no mitigating circumstances warranting a life sentence.[1]  Accordingly, the state court

---

[1] *See* TEX. CODE CRIM. P. art. 37.071, § 2(b), (e) (requiring jury to evaluate three special issues before the death penalty may be imposed).

sentenced Clark to death. On mandatory appeal, the Texas Court of Criminal Appeals affirmed the judgment.[2]

## C

Clark filed an application for a writ of habeas corpus in Texas state court, asserting several claims of ineffective assistance of counsel. Clark alleged that the "principle [sic] ground upon which counsel rendered ineffective assistance" was his failure to investigate and present mitigating evidence at the punishment stage of the trial. To support this claim, Clark presented a one-and-a-half page affidavit from his mother, in which she stated that she had not been contacted by defense counsel. The affidavit also described several difficult circumstances Clark faced in his childhood and early adulthood, including a general lack of supervision, family alcoholism, abuse, and the suicide of his brother.

The state habeas court denied relief on all of Clark's claims, concluding that counsel's performance was not deficient and that Clark had not demonstrated prejudice. Based on the trial court's findings and its own review, the Texas Court of Criminal Appeals denied relief.[3]

Clark then filed the underlying habeas petition in federal court. He again asserted, among other claims of ineffective assistance, that his counsel had failed to conduct any investigation regarding mitigating evidence. In addition to his mother's affidavit, he presented an affidavit from his trial counsel and a thirty-page report from a mitigation specialist. The trial counsel's affidavit stated that counsel essentially failed to conduct any investigation whatsoever into mitigating evidence because "[a]t the time Troy's case was tried, mitigation practice was almost unknown." The mitigation specialist's report provided information paralleling that contained in Clark's mother's affidavit but in

---

[2] *Clark v. Texas*, No. 73,816 (Tex. Crim. App. Nov. 25, 2002) (unpublished).

[3] *Ex parte Troy Clark*, No. 55,996-01, 2003 Tex. Crim. App. LEXIS 1033 (Tex. Crim. App. Oct. 1, 2003) (unpublished).

significantly more detail. The report also contained new evidence demonstrating that Clark experienced severe poverty as a child; witnessed his mother's male partners use violence against her; witnessed the murder of a friend at age nine; and was forced into criminal activity at an early age.

Considering both the evidence before the state court and the additional evidence presented in federal court, the district court disagreed with the state habeas court's conclusion that counsel's performance in failing to investigate mitigating evidence was not deficient. The district court denied federal habeas relief on this issue, however, determining that the state court's conclusion that Clark had not demonstrated prejudice was not an unreasonable application of federal law. The district court also denied relief on Clark's other claims. The court granted a COA as to Clark's mitigation investigation claim, but denied COAs on Clark's other claims.

Clark now appeals the district court's denial of his ineffective assistance claim regarding mitigation evidence and also petitions this court for a COA as to his remaining claims.

## II

Our review of Clark's contention that his trial counsel provided ineffective assistance by failing to investigate and failing to present mitigation evidence is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). Because this claim was "adjudicated on the merits in State court proceedings,"[4] we evaluate it under the "'difficult to meet'"[5] and "'highly deferential standard for evaluating state-court rulings,'"[6] which is contained in 28 U.S.C. § 2254(d).

---

[4] 28 U.S.C. § 2254(d).

[5] *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)).

[6] *Id.* (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

No. 07-70037

That section provides that we may not grant relief unless adjudication of Clark's claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[7]

"Claims of ineffective assistance of counsel involve mixed questions of law and fact and are governed by § 2254(d)(1)."[8]  Clark carries the burden of proof.[9]

## A

As an initial matter, this court questioned whether we are authorized to consider the substantially more detailed mitigation evidence that Clark presented to the federal district court.  As noted above, Clark did not present his trial counsel's affidavit or the mitigation specialist's report to the state habeas court.  At the time Clark filed his federal habeas petition, this court had held that "problems presented by evidence introduced for the first time in federal court in support of a federal habeas application are more accurately analyzed under the 'exhaustion' rubric of § 2254(b), not as issues of 'factual development' under § 2254(d)."[10]  We requested supplemental briefing on this issue.

During the pendency of this appeal, however, the Supreme Court's decision in *Cullen v. Pinholster* held that, with respect to § 2254(d)(1), review "is limited

---

[7] 28 U.S.C. § 2254(d).

[8] *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir.) (citing *Briseno v. Cockrell*, 274 F.3d 204, 206-08 (5th Cir. 2001)), *cert. denied*, 131 S. Ct. 265 (2010).

[9] *Pinholster*, 131 S. Ct. at 1398 (citing *Visciotti*, 537 U.S. at 25).

[10] *Lewis v. Quarterman*, 541 F.3d 280, 284 (5th Cir. 2008) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000)) (internal quotation marks omitted).

to the record that was before the state court that adjudicated the claim on the merits."[11]  The Supreme Court derived this limitation from the "backward-looking language" of § 2254(d)(1).[12]  The Court also reasoned that "[s]ection 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief."[13]  The Court recognized that "[i]t would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*."[14]  The Supreme Court reiterated at another point in *Pinholster* that "evidence introduced in federal court has no bearing on § 2254(d)(1) review."[15]  It emphasized, "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."[16]

The State contends in the present case that, to the extent material in the mitigation expert's affidavit duplicated information in the affidavit of Clark's mother that was presented to the state habeas court, the evidence is exhausted. To the extent that the mitigation expert's affidavit sets forth new or different information, the State contends this is unexhausted.  Clark contends that all of the evidence presented to the federal district court simply supplements the claim that he made in state habeas court and is therefore exhausted.  The Supreme

---

[11] *Pinholster*, 131 S. Ct. at 1398.

[12] *Id.*

[13] *Id.* at 1399.

[14] *Id.*

[15] *Id.* at 1400.

[16] *Id.*

Court faced similar arguments in *Pinholster*.[17] The Court held that it "need not resolve this dispute because, even accepting Pinholster's position," the Court was "precluded from considering" the evidence adduced in the district court that additionally supported Pinholster's claim.[18] Once the Supreme Court determined, based only on the record that was before the state court, that the petitioner was not entitled to relief under § 2254(d), it pronounced, "[O]ur analysis is at an end."[19]

In light of the teachings in *Pinholster*, we are not tasked with determining whether all of the new evidence that Clark presented to the federal district court was exhausted.[20] We consider only the record that was before the state habeas court. To prevail on his ineffective assistance claim, then, Clark "must overcome the limitation of § 2254(d)(1) on the record that was before the state court."[21]

**B**

We review the district court's legal conclusions de novo and its factual findings for clear error.[22] We must determine whether the state court's denial of relief "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[23] Because Clark seeks relief on the basis of

---

[17] *Id.* at 1402 n.11.

[18] *Id.*

[19] *Id.* at 1411 n.20.

[20] *Id.* at 1402 n.11.

[21] *Id.* at 1400; *see also Pape v. Thaler*, 645 F.3d 281, 287-88 (5th Cir. 2011) (applying *Pinholster* to limit review under § 2254(d)(1) to the record before the state court), *cert. denied*, 132 S. Ct. 1100 (2012).

[22] *Ladd v. Cockrell*, 311 F.3d 349, 351 (5th Cir. 2002).

[23] 28 U.S.C. § 2254(d)(1).

ineffective assistance of counsel, the "clearly established federal law" against which we measure the state court's denial of relief is the standard set forth in *Strickland v. Washington*.[24] To prevail under *Strickland*, Clark must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense.[25]

Though the state court did not specifically refer to *Strickland*, Clark does not argue that the state court's decision was contrary to federal law. Accordingly, the question is whether the state court's application of *Strickland* to the facts before it was unreasonable.[26] It bears emphasis that this inquiry is "different from asking whether defense counsel's performance fell below *Strickland*'s standard."[27] As the Supreme Court has repeatedly admonished, "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'"[28] Thus, under § 2254(d), we first "must determine what arguments or theories supported or . . . could have supported[] the state court's decision."[29] We must then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the

---

[24] 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362, 391 (2000) ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'").

[25] *Strickland*, 466 U.S. at 687.

[26] *See Catalan v. Cockrell*, 315 F.3d 491, 493 n.3 (5th Cir. 2002) (assuming that the Texas court applied *Strickland* when, as in this case, the parties briefs centered around the *Strickland* analysis); *see also Harrington v. Richter*, 131 S. Ct. 770, 784 (2011) (noting that "this Court has observed [that] a state court need not cite or even be aware of our cases under § 2254(d)" (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam))).

[27] *Richter*, 131 S. Ct. at 785.

[28] *Id.* (quoting *Williams*, 529 U.S. at 410).

[29] *Id.* at 786.

holding in a prior decision of" the Supreme Court.[30]   The state court's determination that Clark's "claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."[31]

**1**

To demonstrate deficient performance under *Strickland*, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness."[32]  "Judicial scrutiny of counsel's performance must be highly deferential,"[33] and "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[34] Under the deferential standard of *Strickland*, we must "affirmatively entertain the range of 'possible reasons [defendant's] counsel may have had for proceeding as they did.'"[35]

When a petitioner argues that his attorney failed to investigate mitigation evidence, the Supreme Court has said the proper inquiry is "not whether counsel should have presented a mitigation case," but "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was *itself reasonable*."[36]  Nonetheless, it has explicitly

---

[30] *Id.*

[31] *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

[32] *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

[33] *Id.* at 689.

[34] *Id.* at 690.

[35] *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) (quoting *Pinholster v. Ayers*, 590 F.3d 651, 692 (9th Cir. 2009) (en banc) (Kozinski, C.J., dissenting), *rev'd sub nom. Cullen v. Pinholster*, 131 S. Ct. 1388 (2011)).

[36] *Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

rejected a "constitutional duty to investigate" applicable to all cases, instead emphasizing that the "constitutionally protected independence of counsel" precludes the establishment of a "particular set of detailed rules" or even "specific guidelines" beyond reasonableness.[37]  In clarifying that its precedents do not compel any particular techniques, the Court emphasized that even *Strickland* stated only that "[c]ounsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary."[38]

In Clark's state habeas petition, he alleged that his counsel did not "investigate [his] family background, or his social, medical, or mental history" and failed to "conduct any interviews" or "retrieve or review any records."  The only evidence Clark submitted to the state habeas court in support of this contention was his mother's affidavit, in which she stated that neither of Clark's trial attorneys, nor any investigator working on their behalf, contacted her.  His mother, Cleta Barrington, described the difficulties faced by Clark as a child in light of her frequent incarceration brought on by drug addiction and prostitution, and the abuses and frequent relocations he suffered while living with various family members while his mother was in prison.  Clark also had a cleft palate as a child and was teased by other children.  It interfered with his speech as well.  Clark's mother explained that he had lived on his own since he was fifteen, when she consented to his marriage to prevent him from being placed in another foster-care program.  She also revealed that Clark held himself responsible for his brother's suicide, which occurred the day after Clark and his brother had fought.  Barrington indicated that had Clark's counsel or anyone working on

---

[37] *Pinholster*, 131 S. Ct. at 1406 (quoting *Strickland*, 466 U.S. at 688-89) (internal quotation marks omitted).

[38] *Id.* at 1407 (quoting *Strickland*, 466 U.S. at 691) (internal quotation marks omitted).

their behalf contacted her to ask about Clark's past, she would have told them what she eventually said in the affidavit.

For the first time in federal district court, Clark submitted additional affidavits from his lead trial counsel and from a social worker who served as a court-appointed mitigation specialist for Clark's habeas counsel. Trial counsel asserted that "mitigation practice in general was embryonic and not well developed as a body of law at the time of Troy's trial," and that this fact and counsel's lack of training in mitigation led to a failure to obtain numerous childhood, employment, and medical records and other evidence of Clark's background that might have been useful to the defense. The mitigation specialist described the results of her research into Clark's difficult and traumatic childhood and his adult life filled with drug addiction and other criminal activity, which might have engendered sympathy had it been presented to the jury. (Much of it may have qualified as hearsay, however, since many of the facts recounted by the mitigation specialist reflected only what she had been told by others.)

Neither of these affidavits was provided to the state habeas court, and as discussed above, evidence that was not before the state court cannot be considered in a proceeding under § 2254(d)(1). We therefore review the state court's decision with reference only to the evidence that it had before it: the trial court record and Barrington's (Clark's mother's) affidavit.

The record from the trial court included the record from a motion for new trial that Clark filed. That motion focused primarily on Clark's claim that his trial counsel was ineffective during the guilt–innocence phase of his trial. Among others, Clark, both of Clark's trial counsel, and a private investigator appointed to Clark's case testified at the hearing on the motion. Some of the testimony addressed potential witnesses suggested by Clark. When asked how he decided which witnesses to interview prior to trial, the investigator said, "I

felt like I was being sent down rabbit trails on numerous occasions in this trial because I'd run one lead down and the story would change, and I would have to attempt to run another lead down." There was minimal discussion of the punishment phase of the trial, including describing what investigation did or did not occur specifically directed toward that end. There was no allegation made or evidence adduced of a failure to investigate mitigation; though that was not the subject of the new trial motion, we nonetheless observe that evidence from that hearing does not assist petitioner in meeting his burden here.

The state habeas court concluded that Clark did not demonstrate deficient performance. In reaching this conclusion, the court acknowledged that counsel had not contacted Clark's mother, but also determined that counsel did, in fact, interview other potential witnesses. The state court did not indicate the basis upon which this conclusion was based, but there is evidence in the record that supports this finding. At the hearing on the motion for new trial, for instance, numerous witnesses were discussed; while this discussion primarily focuses on the guilt–innocence phase, speaking with Clark's friends and associates would likely have given counsel information that would have related to Clark's background and character, as well as potential mitigation evidence. Furthermore, from his experiences with these witnesses, counsel may have drawn conclusions that future investigation would be fruitless; while counsel stated that "I can't recall anyone that [Clark] told us to go talk to and we did not," he also explained the problems with some of Clark's witnesses. For instance, one witness's story was "absolutely consistent" with Clark's, but when she was needed for the trial, "we couldn't find her and we tried." Another witness's statements did not match what Clark indicated she would say.

Additionally, during the punishment phase, the court conducted a colloquy with Clark before it would allow him to testify. During that proceeding, the following exchange occurred between Clark and his counsel, Bobby Mims:

No. 07-70037

> MR. MIMS: Well, that's not my question right now. . . . My question is: You're going to get up there and testify against the advice of counsel?
>
> CLARK: Yeah.
>
> MR. MIMS: With respect to your punishment, is that correct?
>
> CLARK: Yeah.
>
> MR. MIMS: All right.  Is it also true that we have asked you to allow us to subpoena your father, Wilburn Clark, to come up and testify for you, haven't we.  You refused to let us do that?
>
> CLARK: Yes, I did.
>
> MR. MIMS: Okay.  And also your mother, Cleta Barrington. We wanted to go get her and bring her from the State facility. She's in the penitentiary somewhere in Arkansas and bring her in and testify for you. Do you remember that? You didn't want us to do that either, did you?
>
> CLARK: No, Sir.
>
> MR. MIMS: Okay.  Have I advised you we have no other witnesses that are willing to come forward and testify in your behalf.  Did we advise of that?
>
> CLARK: The people that have come that I called them, told them not to come.
>
> MR. MIMS: Yes, sir, in fact, you did call some people and tell them not to come and testify in your behalf, didn't you?
>
> CLARK: Yes, sir.

On this record, the state court's determination that Clark's counsel interviewed other witnesses was not an unreasonable determination of the facts.[39]  The state court did not discuss whether counsel considered any other sources of mitigating evidence, and the record before the state court was silent on this point.  There is a strong presumption under *Strickland* in favor of competent performance by counsel, however, and the burden of demonstrating

---

[39] *See* 28 U.S.C. § 2254(d)(2).

14

deficient performance falls on the petitioner.[40]  Clark alleged that counsel's investigation was completely deficient, but the only evidence he provided to the state court to support that allegation was his mother's affidavit.  From this, the state court could conclude that trial counsel did not speak with Clark's mother, but could not readily conclude that he had done no other investigation, as alleged in Clark's application for writ of habeas corpus.  Instead, there was evidence indicating that counsel had conducted an investigation for the guilt–innocence phase that may have implicated mitigating factors; that this investigation had run into numerous roadblocks and "rabbit trails," partially due to Clark's directions; and that counsel had at least proposed to speak with Clark's mother and father, but Clark prevented them from being subpoenaed.

The Supreme Court has admonished courts reviewing a state court's denial of habeas relief under AEDPA that they are "required not simply to 'give [the] attorney's the benefit of the doubt,' . . . but to affirmatively entertain the range of possible 'reasons [petitioner's] counsel may have had for proceeding as they did.'"[41]  The *Strickland* decision "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."[42]  Clark's counsel could reasonably have concluded that, in light of the substantial and severely damaging evidence the State would present regarding Clark's history, a mitigation defense would be a two-edged sword and might well bolster the State's position that the death penalty was in order.  Clark's counsel could reasonably have concluded that the best defense was to focus on the lack of future dangerousness if Clark were imprisoned for life.  That is clearly the

---

[40] *See Strickland*, 466 U.S. at 687-91.

[41] *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) (alteration in original) (internal citation omitted) (quoting *Pinholster v. Ayers*, 590 F.3d 651, 673 (9th Cir. 2009); *id.* at 692 (Kozinski, C.J., dissenting)) (internal quotation marks omitted).

[42] *Harrington v. Richter*, 131 S. Ct. 770, 790 (2011) (citing *Strickland*, 466 U.S. at 688).

strategy that was employed at trial. It was the only argument made to the jury in summation at the conclusion of the penalty phase of the trial.

The state court determined that Clark did not demonstrate that counsel's performance was deficient. That determination "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."[43] Under Supreme Court precedent, Clark's counsel had "a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary,"[44] and we must "affirmatively entertain the range of possible reasons [defendant's] counsel may have had for proceeding as they did."[45] In light of the state court's finding that defense counsel interviewed other witnesses, and with only minimal evidence before the state court to establish counsel's deficiency, we believe fairminded jurists could disagree on the correctness of the state court's determination that counsel's performance was not deficient. Accordingly, federal habeas relief is precluded.

**2**

The State contends that, as an alternate ground of decision, we should deny Clark habeas relief because he would have precluded his counsel from calling any mitigation witnesses even had an adequate mitigation investigation been conducted. The State relies on the Supreme Court's decision in *Schriro v. Landrigan*.[46] The *Landrigan* decision held that "it was not objectively unreasonable for [a state] court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland*

---

[43] *Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

[44] *Strickland*, 466 U.S. at 691 (emphasis added).

[45] *Pinholster*, 131 S. Ct. at 1407 (quoting *Pinholster*, 590 F.3d at 692 (Kozinski, C.J., dissenting)).

[46] 550 U.S. 465 (2007).

prejudice."[47]   The circumstances of this case do resemble those addressed in *Landrigan*.  However, they are not identical.  Though the Supreme Court in *Landrigan* specifically stated that it had never imposed an "informed and knowing" requirement on a defendant's decision not to introduce evidence, it assumed without deciding that such a requirement existed.[48]   Here, no court below passed on whether any waiver by Clark was informed and knowing, and the record is more ambiguous than the record in *Landrigan*.  Accordingly, we assume, without deciding, that *Landrigan* does not control.

We nevertheless conclude, as an alternate holding, that federal habeas relief is precluded on this claim because the state court's determination that Clark did not demonstrate prejudice is not an unreasonable application of federal law.

To establish prejudice under *Strickland*, Clark must show "a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[49] This court must "'reweigh the evidence in aggravation against the totality of available mitigating evidence.'"[50]

The decision in *Strickland* makes clear that in assessing prejudice, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently."[51]   Rather, *"Strickland* asks

---

[47] *Id*. at 478.

[48] *Id*. at 479.

[49] *Strickland*, 466 U.S. at 695.

[50] *Pinholster*, 131 S. Ct. at 1408 (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

[51] *Richter*, 131 S. Ct. at 791 (citing *Wong v. Belmontes*, 130 S. Ct. 383, 390 (2009) (per curiam); *Strickland*, 466 U.S. at 693).

whether it is 'reasonably likely' the result would have been different."[52]  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"[53]  "The likelihood of a different result must be substantial, not just conceivable."[54]

Aside from expert testimony that, based on actuarial models, Clark would not have been a future danger in prison, the defense presented no mitigating evidence at the punishment phase of the trial.  In the state habeas court, Clark presented additional mitigating evidence contained in his mother's affidavit, which showed that: (1) Clark was born with a cleft palate, causing speech problems that invited ridicule from peers and family; (2) Clark's mother had a drug habit that she supported by prostitution, causing her to be incarcerated for most of Clark's life; (3) Clark's father was not a presence; (4) Clark moved around from home to home during his childhood; (5) Clark was subjected to physical abuse by family members and exposed to family alcoholism; (6) Clark married at 15 to avoid placement in a foster-care program and has been on his own since; and (7) when Clark was 20, his brother committed suicide the day after arguing with Clark.

Clark argued to the state habeas court that this additional evidence presented "a hugely sympathetic case for mitigating a death sentence."  For several reasons, we disagree.  First, we have previously held that such evidence is "double-edged" in that while it "might permit an inference that he is not as morally culpable for his behavior, it also might suggest [that the defendant], as

---

[52] *Id.* at 792 (quoting *Strickland*, 466 U.S. at 696).

[53] *Id.* (quoting *Strickland*, 466 U.S. at 693, 697).

[54] *Id.* (citing *Strickland*, 466 U.S. at 693).

a product of his environment, is likely to continue to be dangerous in the future."[55] Accordingly, "it is uncertain whether reasonable counsel would have used the evidence had it been available; in any event, it is unlikely to have had a significant mitigating effect had counsel presented it."[56]

Second, it is unclear whether much of the evidence in Clark's mother's affidavit would have been admissible, a factor relevant to the quality of the mitigating evidence.[57] The state court determined that the affidavit included "significant hearsay and conclusory statements, much of which would not have been admissible at trial."

Third, it is questionable whether the jury would have been influenced by the minimal mitigating evidence due to Clark's own behavior on the witness stand at the punishment phase of trial. Clark continued to deny his guilt, expressed no remorse, and testified that he wanted the death penalty to be imposed. After the prosecutor asserted that Clark was trying to manipulate the jury into thinking that he wanted the death penalty so the jury would give him a life sentence instead, Clark entered into a contentious exchange with the prosecution. Clark also used profanity, causing the court to admonish him to watch his language.

Finally, and most importantly, the aggravating evidence in Clark's case was overwhelming, a circumstance which we have observed makes it "virtually impossible to establish prejudice."[58] The evidence at trial demonstrated that,

---

[55] *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002).

[56] *Id.*

[57] *See Neal v. Puckett*, 286 F.3d 230, 241-42 (5th Cir. 2003) (en banc).

[58] *Ladd*, 311 F.3d at 360 (citing *Strickland*, 466 U.S. at 698; *Jones v. Johnson*, 171 F.3d. 270, 277 (5th Cir. 1999); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989)); *cf. Schiro v. Landrigan*, 550 U.S. 465, 480-81 (2007) ("In sum, the District Court did not abuse its discretion in finding that Landrigan could not establish prejudice based on his counsel's failure to present the evidence he now wishes to offer. Landrigan's mitigation evidence was weak,

No. 07-70037

fearing criminal penalties for his drug-dealing activities, Clark assaulted, bound, kidnaped, beat, and drowned his victim before dumping her body in a barrel, pouring lime and cement over it, and hiding the barrel in a remote location. In addition to Clark's long criminal history, the State also demonstrated that Clark had committed two other murders, including one murder that occurred *after* Muse's death but prior to Clark's apprehension. As the Supreme Court recently recognized, evidence that a defendant "committed another murder [is] the most powerful imaginable aggravating evidence."[59] Moreover, the State demonstrated that Clark had also committed kidnaping, violent assault, and forcible rape, as well as set a vehicle ablaze. As to the defense expert's testimony that Clark could successfully function in prison, other evidence showed that Clark had previously been disciplined in prison for various rule infractions. Clark's expert was also forced to admit, on cross-examination, that the actuarial models on which his testimony was based had proven incorrect in the past. Finally, a state expert testified that Clark suffered from "antisocial personality disorder" and that his personality would not change.

For all of these reasons, and particularly due to the overwhelming nature of the aggravating evidence, there is no reasonable probability that, had the jury heard the evidence contained in Clark's mother's affidavit, it would not have imposed the death penalty.[60] The state court's determination that Clark did not

---

and the postconviction court was well acquainted with Landrigan's exceedingly violent past and had seen first hand his belligerent behavior.").

[59] *Wong v. Belmontes*, 130 S. Ct. 383, 391 (2009) (per curiam) (internal quotation marks omitted).

[60] *Cullen v. Pinholster*, 131 S. Ct. 1388, 1408 (2011) ("'[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" (alteration in original) (quoting *Strickland v. Washington*, 466 U.S. 668, 695 (1984))); *Harrington v. Richter*, 131 S. Ct. 770, 793 (2011) ("The likelihood of a different result must be substantial, not just conceivable." (citing *Strickland*, 466 U.S. at 693)).

demonstrate prejudice was therefore well within the bounds of AEDPA reasonableness. At best, Clark can demonstrate that "'fairminded jurists could disagree' on the correctness of the state court's decision,"and federal habeas relief is therefore precluded.[61]

## III

We turn now to Clark's application for COAs on his other ineffective assistance claims. Under AEDPA, a prisoner whose habeas petition has been denied in district court may not appeal "[u]nless a circuit justice or judge issues" a COA.[62] To obtain a COA, Clark must make "a substantial showing of the denial of a constitutional right."[63] To make such a showing, he must demonstrate "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[64] Our task is to "look to the District Court's application of AEDPA['s]" deferential framework "to petitioner's constitutional claims and ask whether [the court's] resolution was debatable among jurists of reason."[65] "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail."[66] "'While the nature of a capital case is not of itself sufficient to warrant the

---

[61] *Richter*, 131 S. Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004))).

[62] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (alteration in original) (quoting 28 U.S.C. § 2253(c)(1)).

[63] 28 U.S.C. § 2253(c)(2).

[64] *Miller-El*, 537 U.S. at 327 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2008)).

[65] *Id.* at 336.

[66] *Id.* at 338.

issuance of a COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor.'"[67]

## A

Clark first claims his trial counsel's closing argument amounted to constitutionally ineffective assistance. Specifically, Clark claims that his attorney's performance was deficient because he abdicated his duty of loyalty to Clark, did not ask the jury for mercy, and failed to present mitigating evidence.

The State argues that Clark's closing argument ineffective assistance claim is procedurally barred because Clark did not raise the claim on direct appeal. The state habeas court determined that the record with respect to Clark's claims concerning closing argument was fully developed at his motion for new trial and that Clark waived the claims by not asserting them on direct appeal. The state court also resolved this claim on the merits, however. The federal district court, citing state law demonstrating that ineffective assistance claims are routinely evaluated for the first time on habeas review, concluded that the alleged procedural bar was not applied "strictly and regularly . . . to the vast majority of claims." Therefore, the district court held the procedural bar was not an adequate ground for the denial of relief.

The State does not address the district court's rationale for rejecting its procedural bar argument in this appeal, instead citing to cases rejecting record-based claims other than ineffective assistance claims. "Although the question of procedural default 'should ordinarily be considered first,' we need not do so 'invariably,' especially when it turns on difficult questions of state law."[68] Here, we believe we can more easily address Clark's request for a COA by considering

---

[67] *Johnson v. Quarterman*, 483 F.3d 278, 285 (5th Cir. 2007) (quoting *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005)).

[68] *Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir. 2004) (quoting *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997)).

No. 07-70037

the potential merit of his ineffective assistance claim. Accordingly, we will assume that the claim is not procedurally defaulted.

As noted above, Clark testified on his own behalf at the sentencing phase of trial, expressing no remorse, stating he wanted to be sentenced to death, and generally behaving belligerently in his exchange with the prosecution. Because Clark did not testify until surrebuttal, his was the last testimony the jury heard before closing arguments. In closing, Clark's counsel adverted to that testimony, calling it a "spectacle." He asked, rhetorically, whether Clark was taunting and manipulating the jury, answering his own question by saying "[A]t this point I really don't care, to tell you the truth. Because I'm not sure that it makes a whole hell of a lot of difference." He told the jury that he was "not going to fuss at [the] verdict," and that Clark was "the most difficult client" he had ever represented. At that point, the court asked the attorneys to approach the bench, querying whether counsel was purposefully trying to create reversible error. Counsel asked to finish his argument, and the court agreed to "see where [he was] going." Counsel thereafter argued that Clark could be successfully institutionalized and then returned to a discussion of Clark's behavior on the witness stand:

> You know, when Troy got up on the witness stand and if you think that's taunting or you think he gave up, either way it is for you to decide. The thing is, you decide. It's not Troy Clark's decision of whether or not he gets death or life. It falls to you. If you think he was trying to manipulate you, taunt you, dare you to sentence him to life, well, if that's the opinion you raised, you can call his bluff and find that the evidence will support the answers that would dictate a death sentence, then that's your judgment.

Immediately following the defense closing, at the court's request, defense co-counsel articulated the defense team's strategy at a bench conference. Counsel noted that "he got up and took the stand and asked for the death sentence," and that "[t]he strategy is it's not his decision to make. It's the jury's to make."

23

At the hearing on Clark's motion for new trial, counsel testified he had discussed the closing argument extensively with co-counsel, and that it was "[e]ntirely a strategic decision" made in light of Clark's testimony that "either challenged the jury or almost tried to incite the jury to give him the death penalty." Counsel testified that he and co-counsel concluded that their only option was to "use some kind of reverse psychology with the jury that, that their decision to give him the death penalty should be made a little more difficult than the defendant's simply saying go ahead." The other attorney testified to the same effect, specifically stating that the closing argument was designed to maintain credibility with the jury and present "one or two arguments that you . . . have to save the fellow's life."

In reviewing this and Clark's other requests for COAs based on ineffective assistance of counsel, we apply the *Strickland* standard discussed above. Our review is also circumscribed by AEDPA's deferential standard, however, making our inquiry "different from asking whether defense counsel's performance fell below *Strickland*'s standard."[69] "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."[70] The Supreme Court has emphasized that "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage."[71] "Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' . . . but which issues to sharpen and how best to clarify them are questions with many reasonable

---

[69] *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

[70] *Id.*

[71] *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003).

answers."[72]    At times, it may "make sense to forgo closing argument altogether."[73] "Judicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas."[74]

The state habeas court concluded that counsel's performance was not deficient, as he employed a "legitimate trial strategy . . . during the closing argument to re-direct the attention of the jury from [Clark's] challenge to execute him to their duty to evaluate the evidence when answering the special issues." The federal district court concluded this determination was not contrary to nor an unreasonable application of federal law.  In his request for a COA, Clark argues that counsel's performance was deficient because counsel violated his duty of loyalty, failed to plead for mercy, and did not discuss mitigating factors.  These claims are not adequate to deserve encouragement to proceed further.

Counsel's strategy in acknowledging that Clark was not likeable in trying to gain credibility with the jury was reasonable.  As we have held, "acknowledgment of aspects of the case can be a proper 'effort to bolster credibility with the jury.'"[75]  Even if at times inartful, counsel's argument was a legitimate strategy to "'sharpen and clarify the issues for resolution by the trier of fact.'"[76]  The gravamen of counsel's argument was to focus the jury's attention on its own responsibility in determining whether to impose a death

---

[72] *Id.* at 6 (internal citation omitted).

[73] *Id.*

[74] *Id.*

[75] *Dowthitt v. Johnson*, 230 F.3d 733, 751 (5th Cir. 2000) (quoting *Kitchens v. Johnson*, 190 F.3d 698, 704 (5th Cir. 1999)).

[76] *Gentry*, 540 U.S. at 6 (quoting *Herring v. New York*, 422 U.S. 862 (1975)).

sentence, regardless of Clark's expressed desire to be sentenced to death. This was not an unreasonable strategy.[77] Counsel also emphasized the defense argument that Clark would not present a significant danger in prison. Thus, the record does not support Clark's argument that counsel violated his duty of loyalty to Clark.[78] Moreover, given the wide range of available strategies, pleading for mercy or presenting mitigating factors in a closing argument is not required. Counsel's closing argument was not constitutionally deficient, and jurists of reason would not debate the district court's conclusion. Moreover, for the reasons discussed above, Clark cannot demonstrate prejudice.[79] We deny Clark's request for a COA on this issue.

**B**

Clark next seeks a COA on his claim that counsel was ineffective in cross-examining the State's main witness, Tory Bush, by opening the door to introduction of evidence of another murder Clark allegedly committed. In addition to the offense at issue in this case, Clark was originally also indicted for the murder of Tracy Mize, whose body was discovered on the same property where Muse's body was found. Prior to trial on the Muse murder, the court granted Clark's motion in limine to prevent the prosecution from introducing evidence of the Mize murder.

---

[77] *Cf. Romero v. Lynaugh*, 884 F.2d 871, 877 (5th Cir. 1989) ("Given his difficult situation, we are not prepared to fault Wood's effort to highlight the heavy responsibility of the jury by not burdening them with the obvious and avoiding the risk of losing them by arguing the absurd. To do so comes close to insisting on a pro forma argument in every case. Had the jury returned a life sentence the strategy might well have been seen as a brilliant move. That it did not does not mean that it was outside the range of reasonable professional assistance.").

[78] *See United States v. Cronic*, 466 U.S. 648, 656-57 (1984) ("[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.").

[79] *See supra* Part II.B.2.

No. 07-70037

Bush, Clark's girlfriend, testified that Clark committed Muse's murder. On cross-examination, defense counsel sought to impeach Bush by demonstrating that she made a number of inconsistent statements to the police regarding Muse's death. Counsel established that, at one point, Bush placed the blame on Mize. Counsel then elicited testimony that Mize had been murdered and that the police found his body while searching for Muse. At this point, the prosecutor urged, and the state judge agreed, that the defense had opened the door to testimony regarding Mize's death. Although this evidence was previously inadmissible, it was now necessary to rehabilitate Bush. On redirect, Bush testified about the circumstances regarding Mize's death, implicating Clark as the murderer. The state also introduced corroborating evidence, such as testimony that the bullets recovered from Mize's body were consistent with those fired from Clark's gun.

At Clark's hearing on his motion for a new trial, counsel explained that the defense team made a strategic decision to impeach Bush with the details of Mize's murder. Specifically, counsel explained that the defense team considered impeaching Bush to be of utmost importance because she was the state's primary witness and because there was a lack of physical evidence connecting Clark to the murder. However, counsel anticipated that it could become necessary to introduce evidence of the Mize murder to impeach Muse effectively. The record supports the state habeas court's conclusions that: (1) counsel was aware of this possibility; (2) it was discussed with Clark prior to trial; and (3) at trial, the defense team conferred with Clark before raising the Mize issue.

Clark cannot demonstrate deficient performance under *Strickland*, as "[j]udicial scrutiny of counsel's performance must be highly deferential."[80] We "indulge a strong presumption that counsel's conduct falls within the wide range

---

[80] *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

27

of reasonable professional assistance."[81]  Clark has not demonstrated that, given the necessity of impeaching Bush's testimony, counsel's decision to violate the motion in limine fell outside of that range.[82]  Furthermore, Clark cannot demonstrate prejudice.  Regardless of Bush's testimony regarding Mize, on direct examination she had already placed the guilt for Muse's murder on Clark.  Also, Clark was granted a limiting instruction in regard to Mize's murder.  Accordingly, reasonable jurists could not debate the district court's decision.  We deny Clark's request for a COA on this claim.

## C

Clark next seeks a COA for an ineffective assistance claim based on counsel's failure to object to the prosecution's questioning of Amber Scroggins.  Specifically, Clark argues that counsel should have objected to Scroggins's testimony that Clark owned a stun gun and that he had bragged about using it on one of his drug customers, Wesley Crocker.  According to Clark, this failure to object opened the door to Crocker's testimony that Clark had him kidnaped, assaulted him with a stun gun, and threatened to kill him.

Clark's argument is untenable.  Scroggins's testimony on direct examination did not lead to the admission of Crocker's testimony.  Rather, the trial judge allowed Crocker's testimony concerning his kidnaping because the defense raised the issue of identity in cross-examining Scroggins, suggesting that she and Bush murdered Muse.  On direct appeal, the Texas Court of Criminal Appeals agreed that Crocker's testimony was not unfairly prejudicial

---

[81] *Id.*

[82] *Cf. Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997) (concluding that attorney's considered strategic decision to directly question witness about the defendant's confession, thereby waiving the marital privilege, did not amount to ineffective assistance of counsel).

because of its value in proving identity.[83] Clark neither disputes this conclusion nor argues that Scroggins's testimony was inadmissible. As we have held, "failure to assert a meritless objection cannot be grounds for a finding of deficient performance."[84] This claim is not adequate to deserve encouragement to proceed further, and we therefore deny Clark's request for a COA on this claim.

**D**

Finally, Clark requests a COA on his claim that counsel rendered ineffective assistance by failing to object to the trial judge's comment during Clark's testimony. In response to a question by the prosecutor, Clark stated that he did not want to "get nobody in trouble" but that he guessed he had to tell the truth. To this, the trial court responded with: "Yeah. You're supposed to." Clark argues that the judge improperly commented on the weight of the evidence and that counsel was thus ineffective in not objecting.

Clark's argument is without merit. In *United States v. Greer*, a witness for the defense, after being unable to answer precisely a number of the prosecution's questions, asked if the prosecution "wanted the truth."[85] The court interjected and reminded the witness that his oath required the truth and that he should testify accordingly.[86] This court determined that there was no error because the "district judge, as overseer of the trial, has the duty to ensure that all witnesses understand the importance of their appearance and adhere to the

---

[83] *Clark v. Texas*, No. 73,816, slip op. at 14-15 (Tex. Crim. App. Nov. 25, 2002) (unpublished).

[84] *Emery*, 139 F.3d at 198 (5th Cir. 1997) (citing *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)); *see also Buxton v. Collins*, 925 F.2d 816, 825 (5th Cir. 1991) (concluding that counsel did not act ineffectively in not objecting to a jury instruction that was not erroneous).

[85] *United States v. Greer*, 806 F.2d 556, 559 (5th Cir. 1986).

[86] *Id.*

oath of truthfulness."[87] Thus, any objection by Clark's counsel "would have been futile, and failure to assert a meritless objection cannot be grounds for finding deficient performance."[88] Accordingly, we deny Clark's request for a COA on this claim.

*       *       *

The judgment of the district court is AFFIRMED. We DENY Clark's requests for further COAs.

---

[87]*Id.*

[88]*Emery*, 139 F.3d at 198 (citation omitted).